IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| NATHANIEL TODD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| WEXFORD HEALTH CARE, | ) | No. 12–cv–1201–MJR–SCW |
| S.A. GODINEZ, | ) | |
| DR. JAMES FENOGLIO, | ) | |
| ELAINE HARDY, and | ) | |
| JEFF KORTE, | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM AND ORDER

REAGAN, District Judge:

INTRODUCTION AND PROCEDURAL BACKGROUND

Plaintiff Nathaniel Todd, currently incarcerated at Western Illinois Correctional Center, filed this case on November 21, 2012, alleging officials at Lawrence Correctional Center acted with deliberate indifference to his knee and back pain. (Doc. 1). After threshold screening, Plaintiff was permitted to proceed on his deliberate indifference theory against three Defendants: Wexford, Martin, and Fenoglio. (Doc. 13).

Plaintiff filed a Motion to Amend his Complaint. (Doc. 17). The Court reviewed the proposed amended complaint, and granted leave to file it. (Doc. 29). The Court found that the Amended Complaint stated a colorable claim against Elaine Hardy, as well as a claim for injunctive relief. (Doc. 29). The Court further found that S.A. Godinez, as director of the Illinois Department of Corrections, and

Marc Hodge, as Warden of Menard Correctional Center, were the appropriate defendants for purposes of injunctive relief. (Doc. 29). Defendant Martin was granted summary judgment on the grounds that Plaintiff failed to exhaust his administrative remedies. (Doc. 135). IDOC has transferred Plaintiff twice since he filed the suit, and ultimately the Court determined that Jeff Korte, as Warden of Plaintiff's current institution, is (along with Godinez) an appropriate party for injunctive relief. (Doc. 157). At present, Plaintiff's case comprises deliberate indifference claims against Hardy, Fenoglio, and Wexford Health Sources, and official-capacity claims against Defendants Godinez and Korte.

The case comes before the Court on respective Motions for Summary Judgment filed by Defendants Fenoglio, Hardy, and Wexford (the "Wexford Defendants") (Doc. 146) and Defendants Godinez and Korte (the "IDOC Defendants") (Doc. 150). The Court also addresses Plaintiff's Second Motion for a Preliminary Injunction (Doc. 138). The motions have fully ripened.

For the reasons explained below, the Court **GRANTS in part and DENIES in part** the Wexford Defendants' Motion for Summary Judgment. (Doc. 146). The Court **DENIES** the IDOC Defendants' Motion for Summary Judgment. (Doc. 150). And finally, the Court **DENIES** Plaintiff's Motion for a Second Preliminary Injunction. (Doc. 138).

## SUMMARY JUDGMENT STANDARD

Summary judgment—which is governed by Federal Rule of Procedure 56—is proper only if the admissible evidence considered as a whole shows there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 517 (7th Cir. 2011) (citing FED. R. CIV. P. 56). The party seeking summary judgment bears the initial burden of demonstrating—based on the pleadings, affidavits and/or information obtained via discovery—the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

After a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). *See also Serednyj v. Beverly Healthcare, LLC*, 656 F.3d 540, 547 (7th Cir. 2011) ("When a summary judgment motion is submitted and supported by evidence . . . the nonmoving party may not rest on mere allegations or denials in its pleadings"). A mere scintilla of evidence supporting the non-movant's position is insufficient to overcome summary judgment; a non-movant will prevail only when it presents definite, competent evidence to rebut the motion. *Estate of Escobedo v. Martin*, 702 F.3d 388, 403 (7th Cir. 2012); *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012). Summary judgment is only appropriate if, on the evidence provided, no reasonable juror could return a verdict in favor of the non-movant. *Carlisle v. Deere & Co.*, 576 F.3d 649, 653 (7th Cir. 2009).

The Court's role on summary judgment is not to evaluate the weight of the evidence, to judge witness credibility, or to determine the truth of the matter, but rather to determine whether a genuine issue of triable fact exists. *Nat'l Athletic*

*Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). The Court considers the facts in a light most favorable to the non-movant—here, Plaintiff. *Srail v. Vill. of Lisle*, 588 F.3d 940, 948 (7th Cir. 2009).

FACTUAL BACKGROUND

Plaintiff was incarcerated at Lawrence Correctional Center from December 2010 through June 14, 2013. (Doc. 1, pp. 6, 14). Prior to his time in prison, Plaintiff had been receiving health care services in the Chicago area. With his Complaint, Plaintiff submitted progress notes covering a variety of issues, including back pain and knee pain. (Doc. 1-7, pp. 1-7). During his deposition, Plaintiff testified that he had two discs removed from his back in September 1995. (Pl.'s Dep. p. 3). He started experiencing knee pain in 1996. (Pl.'s Dep. p. 3). Lakeside VA performed an operation to remove bone spurs from Plaintiff's knee in 2001. (Pl.'s Dep. p. 11). Plaintiff also testified that he had a second back surgery that same year. (Pl.'s Dep. p. 6). Circle Family Care of Chicago, Illinois, evaluated Plaintiff for right knee pain in April of 2008. (Doc. 1-5, p. 19).

In May of 2008, Plaintiff was evaluated by Resurrection Heath Care of Chicago, Illinois, for various issues, including bone spurs and right knee pain. (Doc. 1-5, pp. 21-28). They performed a radiology study on Plaintiff's right knee on May 19, 2008 that shows "moderate degenerative changes." (Doc. 1-5, p. 26). The CCBHS Ambulatory and Community Health Network Community Access Program referred Plaintiff for an MRI on his right knee in 2008; it showed a complex tear in the medial meniscus and "severe" tricompartmental osteoarthritis. (Doc. 1-5, pp. 8-11).

4

The Cook County Bureau of Health Services performed a radiology study on Plaintiff's knee in February 2009, which showed "moderate degenerative changes." (Doc. 1-5, p. 15).   They performed a study on Plaintiff's lumbosacral spine on October 23, 2009.   That study showed severe degenerative changes at L4/5 and L5/S1.

In November 2009, Cermark Health Services of Cook County recommended NSAIDS (non-steroidal anti-inflammatory) painkillers and a total knee replacement when released from IDOC custody due to osteoarthritis in the right knee, decreased range of motion, and decreased extension.  (Doc. 1-5 pp. 12-14).

Plaintiff testified at the hearing on his First Motion for a Preliminary Injunction that he had attempted to present those pre-incarceration records to Martin and Fenoglio at Menard multiple times; that they would never look at them. (Doc. 122, p. 5).

Plaintiff saw Fenoglio at the Combo Chronic Clinic at Lawrence Correctional Center on January 13, 2011.  (Doc. 147-1, p. 1).  Fenoglio signed a low bunk permit for Plaintiff.  (Doc. 147-1, p. 2) (Doc. 149).  Fenoglio next saw Plaintiff on February 10, 2011, because Plaintiff was refusing his blood sugar checks.  (Doc. 147-1, p. 3). Plaintiff was argumentative; Fenoglio asked him to leave before he could conduct an examination.  (Doc. 147-1, p. 3).  However, Fenoglio made a note to get a release for Plaintiff's prior medical records.  (Doc. 147-1, p. 3).  A Heath Care Administrator note indicates that Plaintiff signed such a release on February 18, 2011.  (Doc. 147-1, p. 4).

Fenoglio testified he did not recall ever looking at Plaintiff's prior medical records until his deposition in this case.  (Fenoglio Dep. p. 16).  He did not recall following up when he did not receive Plaintiff's medical records after the February 18, 2011 appointment.  (Fenoglio Dep. p. 16).  Fenoglio deponed that—while he usually reviewed a patient's medical history—he would not look at the whole chart or every page in the chart.  (Fenoglio Dep. p. 13).  Fenoglio stated he would look at various reports in a patient's medical record; he does not recall looking at any reports from Plaintiff's medical records.  (Fenoglio Dep. p. 13).

Fenoglio saw Plaintiff again on February 18, 2011 to address Plaintiff's report that he had been diagnosed with prostate cancer.   (Doc. 147-1, p. 5). Fenoglio's subjective assessment of that date indicates that Plaintiff ambulated easily without a limp and hopped up on the exam table.  (Doc. 147-1, p. 5).  Plaintiff testified that he told Fenoglio during this visit that he had knee and back pain. (Doc. 147-2, p. 4).  Fenoglio told Plaintiff those issues would have to be addressed separately because he was only there to discuss Plaintiff's prostate cancer and diabetes that day.  (Doc. 147-2, p. 4).

Plaintiff saw Defendant Hardy on April 28, 2011.  (Doc. 147-1, p. 6).  He had been referred for evaluation of his right knee.  (Doc. 147-1, p. 6).  Hardy noted Plaintiff's knee had limited movement and only 80% extension.  (Doc. 147-1, p. 6). Hardy did not find any evidence of crepitus, a type of grating or cracking noise from the joints, or instability.  (Doc. 147-1, p. 6).  Hardy noted that Plaintiff reported that he needed his knee replaced.  (Doc. 147-1, p.6).  Hardy ordered an X-ray; ordered

Plaintiff's outside medical records; and prescribed Ultram (a pain reliever), an iron supplement, and a topical analgesic balm. (Doc. 147-1, p. 6). The X-rays were taken on May 3, 2011. (Doc. 147-1, p. 7). They noted degenerative changes "with prominent periarticular osteophytes" and a bony exostosis. (Doc. 147-1, p. 7). The X-ray also noted degenerative changes and spurring in Plaintiff's lumbar spine. (Doc. 14701, p. 7). The impression also noted hypertrophy and sclerosis. (Doc. 147-1, p. 7). The report did not assign a value judgment (e.g. "mild" or "severe") to the severity of Plaintiff's conditions. (Doc. 147-1, p. 7). Fenoglio testified that in the absence of such language, he would have to look at the X-rays themselves to make a determination. (Fenoglio Dep. p. 20). But he testified that he never reviewed the May 2011 X-rays. (Fenoglio Dep. p. 20).

Plaintiff next saw Fenoglio on July 1, 2011. (Doc. 147-1, p. 8). Fenoglio reported that Plaintiff was again argumentative during this visit, and that he alleged that his diet and medication was increasing his pain. (Doc. 147-1, p. 8). Fenoglio further noted that Plaintiff's X-rays showed arthritis in Plaintiff's right knee and back, and diagnosed him with osteoarthritis. (Doc. 147-1, p. 8). Fenoglio increased Plaintiff's Ultram prescription. (Doc. 147-1, p. 8).

Between June 21, 2011 through July 22, 2011, Plaintiff refused his medication 17 times. (Doc. 147-6). Plaintiff frequently refused all of his medication without singling out one particular medication over the other. (Doc. 147-6). Plaintiff never agreed to sign a refusal form, and some of the documented refusals

indicate that Plaintiff failed to come to his cell door to receive the medication. (Doc. 147-6).

Fenoglio saw Plaintiff again on July 25, 2011. (Doc. 147-1, p. 9). Plaintiff reported that the Ultram was not working, and Fenoglio prescribed Tylenol instead. (Doc. 147-1, p. 9). Fenoglio testified during his deposition that he made the switch because he reviewed the medical records and saw that Plaintiff had been refusing the Ultram. (Fenoglio Dep. p. 11). He also testified that Tylenol is a lighter pain medication and that he made the switch to a lighter medication and not a stronger one because Plaintiff was refusing his medication. (Fenoglio Dep., p. 11). Fenoglio did not know why Plaintiff refused his medication. (Fenoglio Dep., p. 11). Tylenol is an accepted treatment for osteoarthritis. (Fenoglio Dep., p. 11). Fenoglio prescribed a cane during the same visit, which Plaintiff agrees helped him to walk. (Doc. 147-1, pp. 9-10) (Doc. 147-2, p. 6).

Plaintiff saw Fenoglio on October 4, 2011, and told him that the Tylenol was not working. (Doc. 147-1, p. 12). Fenolgio wrote him a prescription for Norco and renewed the Tylenol as well. (Doc. 147-1, pp. 12-13; Fenoglio Dep., p. 11). Plaintiff refused his Norco medication 28 times between October 5, 2011 and October 27, 2011. (Doc. 147-6). Fenoglio discontinued the prescription on October 27, 2011. (Doc. 149).

Plaintiff had an appointment with Fenoglio on December 2, 2011. (Doc. 147-1, p. 14). Plaintiff stated he was refusing his diabetes medication because it was

delivered 2 to 3 hours before food was served. (Doc. 147-1, p. 14). Fenoglio's notes indicate that Plaintiff then insulted him and was asked to leave. (Doc. 147-1, p. 14).

Plaintiff was scheduled for the Combo Clinic on December 19, 2011. (Doc. 147-1, p. 15). Plaintiff refused the clinic and refused to be examined for his knee. (Doc. 147-1, p. 15). At that time, Fenoglio gave him a low bunk, low gallery permit, and a cane permit with an indefinite expiration date. (Doc. 147-1, p. 16).

On March 16, 2012, Hardy saw Plaintiff. (Doc. 147-1, p. 17). She noted a bony exostosis on Plaintiff's right knee and referred to it as a "gross deformity." (Doc. 147-1, p. 17). She noted swelling and decreased range of motion. (Doc. 147-1, p. 17). She ordered Plaintiff a knee sleeve and referred him to a physical therapist for an evaluation. (Doc. 147-1, p. 17).

Plaintiff had additional X-ray views of his knee done in March 2012. (Doc. 1-5, pp. 2-3). The March X-ray noted no significant interval changes from Plaintiff's previous X-ray. (Doc. 147-1, p. 18).

Plaintiff's physical therapy planning session took place on May 9, 2012. (Doc. 147-1, p. 19). Emily Thomman, physical therapist at Lawrence Correctional Center, recommended a physical therapy regime to increase Plaintiff's range of motion and decrease his pain. (Doc. 147-1, p. 19). Her evaluation noted significant right knee pain, and a history of a right meniscus tear, for which Plaintiff had surgery in April 2001. (Doc. 147-1, p. 19). Plaintiff described his pain as a 10 out of 10. (Doc. 147-1, p. 19). Thomman also reported audible joint crepitus. (Doc. 147-1, p. 19). Fenoglio approved Thomman's treatment plan. (Doc. 147-1, p. 20).

Plaintiff had his first physical therapy appointment on May 11, 2012. (Doc. 147-1, p. 21). He reported pain of 10 out of 10. (Doc. 147-1, p. 21). He also reported that he did not have any pain medication, that he was sore from attempting the exercises, and that he needed a total knee replacement. (Doc. 147-1, p. 21). His next appointment took place on May 15, 2012. (Doc. 147-1, p. 23). Plaintiff reported his pain was at 9 out of 10. (Doc. 147-1, p. 23). The assistant noted that Plaintiff's knee had a moderate amount of swelling. (Doc. 147-1, p. 23). Plaintiff's third physical therapy appointment took place on May 18, 2012. (Doc. 147-1, p. 25). Plaintiff reported that his pain while resting was 7 out of 10, but that with any movement it increased to 10 out of 10. (Doc. 147-1, p. 25). The assistant noted that Plaintiff reported that the Tylenol does not help his pain. (Doc. 147-1, p. 25).

Plaintiff had his next appointment on May 23, 2012. (Doc. 147-1, p. 27). He reported pain at 9 out of 10. (Doc. 147-1, p. 27). Plaintiff self-reported difficulties sleeping due to pain and increased popping and clicking noises in his knee. (Doc. 147-1, p. 27). The assistant noted that Plaintiff showed no signs of difficulty when ambulating to the therapy department with his quad cane. (Doc. 147-1, p. 27). Plaintiff's next physical therapy appointment took place on May 29, 2012. (Doc. 147-1, p. 30). Plaintiff rated his pain at a level 8. (Doc. 147-1, p. 30). Plaintiff reported increased swelling. (Doc. 147-1, p. 30). Plaintiff refused to do his exercises on this date due to pain in his left side. (Doc. 147-1, pp. 32-33). The assistant reported Plaintiff appeared to have no change from their last meeting. (Doc. 147-1, p. 33).

The medical records contain a refusal for physical therapy on June 6, 2012. (Doc. 147-1, p. 34). The notes from the assistant noted that Plaintiff was cooperative more often than not. (Doc. 147-1, pp. 23-34). Plaintiff testified during his deposition that he never refused his appointments, but he missed some appointments because he walked too slowly and the guards would close the gate on him before he could get to the appointments. (Pl.'s Dep. p. 5).

Hardy saw Plaintiff on June 14, 2012. (Doc. 147-1, p. 35). At that time, Plaintiff inquired why his physical therapy sessions had been stopped and denied refusing his therapy. (Doc. 147-1, p. 35). Hardy documented a healthy appearance and noted that Plaintiff was ambulatory with minimal use of his cane. (Doc. 147-1, p. 35). She prescribed Naprosyn, an anti-inflammatory pain medication. (Doc. 147-1, p. 35).

On July 10, 2012, Plaintiff reported that he slipped and fell, and saw Hardy for these issues. (Doc. 147-1, p. 37). Plaintiff reported that he fell on his left side, but reported right hip and knee pain. (Doc. 147-1, p. 37). Hardy ordered another X-ray. (Doc. 147-1, p. 37). The X-ray showed "mild to moderate osteoarthritis of the knee," and a "mild degree of osteoarthritis of the hip joints bilaterally as well as sacroiliac osteoarthritic change and degenerative change of the lower lumbar spine." (Doc. 1-5, p. 3). Hardy continued the Naprosyn prescription, as Naprosyn is an appropriate treatment for osteoarthritis. (Doc. 152).

Plaintiff did not receive medical treatment again until January 9, 2013. (Doc. 147-1, p. 39). He repeated his complaints of pain, and Hardy changed his

11

medication to Mobic, which is also approved for osteoarthritis. (Doc. 147-1, p. 39) (Doc. 152). Hardy followed up with Plaintiff on February 1, 2013, at which time Plaintiff reported that Mobic was helping to increase his mobility and decrease his pain. (Doc. 147-1, p. 40). Hardy increased his Mobic prescription. (Doc. 147-1, p. 40). Hardy saw Plaintiff again on March 27, 2013, at which time Plaintiff reported that the Mobic was no longer helping him. (Doc. 147-1, p. 42). Hardy changed his prescription to Salsalate. (Doc. 147-1, p. 42).

Plaintiff testified that he told Fenoglio that another doctor had recommended knee surgery approximately 40 times. (Pl.'s Dep. p. 14). Fenoglio testified that he did not see the 2009 recommendation for knee surgery until his deposition on June 27, 2014. (Fenoglio Dep. p. 28). He testified that he did not weigh Plaintiff's self-reporting as much as he would have the actual record because "inmates say things all the time." (Fenoglio Dep. p. 28). Fenoglio does not believe that Plaintiff should have been referred to an outside specialist. (Fenoglio Dep. p. 28). He testified that if he had known about Plaintiff's earlier recommendation for surgery, that would have been a piece of objective information he would have considered. (Fenoglio Dep. p. 28). Cost and the effectiveness of conservative treatments would be other factors. (Fenoglio Dep. p. 25).

The Court granted Plaintiff's First Preliminary Injunction in part on March 26, 2014. (Doc. 135). That Order directed the IDOC to have Plaintiff evaluated for his continuing back and knee pain. (Doc. 135). On March 12, 2014, after being transferred to Western Illinois Correctional Center, Plaintiff underwent an

examination by a nurse. (Doc. 139-8). The nurse noted that the Correctional Center had no chart and no lab reports for Plaintiff. (Doc. 139-8, p. 1). Plaintiff self-reported that he had two surgeries on his right knee and a back surgery. (Doc. 139-8, p. 1).

On April 2, 2014, Plaintiff was seen by Dr. Thomas Baker (not a party here) regarding his history of back and knee pain. (Doc. 139-9). Baker noted there were no back/spine X-rays in Plaintiff's chart. (Doc. 139-9). He also noted that Plaintiff self-reported his prior surgeries. (Doc. 139-9). Baker took a complete history, and included Plaintiff's remarks that he had been referred for knee replacement, that Menard took away his narcotic medication, that he had suffered a fall while at Lawrence, and that he wanted low bunk/low gallery and cane permits. (Doc. 139-9, p. 2). Plaintiff also described his pain, which Baker recorded. (Doc. 139-9, p. 2). Baker's objective assessment noted that Plaintiff walked with a limp. (Doc. 139-9, p. 3). Plaintiff's right knee was objectively larger than his left knee, and there was a hard knot on the right tibial plateau. (Doc. 139-9, p. 3). Baker evaluated Plaintiff's flexion. (Doc. 139-9, p. 3). Baker did not see any muscle spasms in Plaintiff's back. (Doc. 139-9, p. 3). Baker ultimately assessed mild to moderate osteoarthritis in the right knee, and chronic back pain. (Doc. 139-9, p. 3). Baker gave Plaintiff low bunk and low gallery permits indefinitely, a cane indefinitely, and a knee sleeve indefinitely. (Doc. 139-9). He also continued his current prescriptions. (Doc. 139-9, p. 3).

ANALYSIS

### 1. Deliberate Indifference to Serious Medical Needs

Prison officials violate the Eighth Amendment's proscription against "cruel and unusual punishments" if they display deliberate indifference to an inmate's serious medical needs. *Greeno v. Daley*, 414 F.3d 645, 652–53 (7th Cir. 2005) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal quotation marks omitted)). *Accord Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009) ("Deliberate indifference to serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution."). A prisoner is entitled to reasonable measures to meet a substantial risk of serious harm — not to demand specific care. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997).

To prevail, a prisoner who brings an Eighth Amendment challenge of constitutionally-deficient medical care must satisfy a two-part test. *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011), (*citing Johnson v. Snyder*, 444 F.3d 579, 584 (7th Cir. 2006)). The first prong is whether the prisoner has shown he has an objectively serious medical need. *Arnett*, 658 F.3d at 750. *Accord Greeno*, 414 F.3d at 653. A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated. *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). *Accord Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (violating the *Eighth Amendment* requires "deliberate indifference to a *substantial* risk of *serious*

harm.") (internal quotation marks omitted) (emphasis added).  Only if the objective prong is satisfied is it necessary to analyze the second, subjective prong, which focuses on whether a defendant's state of mind was sufficiently culpable.  *Greeno v. Daley*, 414 F.3d 645, 652–53 (7th Cir. 2005).

Prevailing on the subjective prong requires a prisoner to show that a prison official has subjective knowledge of—and then disregards—an excessive risk to inmate health.  *Greeno*, 414 F.3d at 653.  The plaintiff need not show the defendant literally ignored his complaint, just that the defendant was aware of the serious medical condition and either knowingly or recklessly disregarded it.  *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008).  Deliberate indifference is not negligence; it is more akin to intentional wrongdoing.  *McGee v. Adams*, 721 F.3d 474, 480 (7th Cir. 2013) (citing *Johnson v. Snyder*, 444 F.3d 579, 585 (7th Cir. 2006)).  The standard is criminal recklessness, and even gross negligence will not meet this standard.  *Id.* at 481.  However, persisting in a course of treatment known to be ineffective can also violate the Eighth Amendment.  *Greeno*, 414 F.3d at 655.  Refusing to adequately investigate and diagnose the source of a prisoner's pain can likewise be a constitutional violation.  *Jervis v. Mitcheff*, 258 F.App'x 3, 6 (7th Cir. 2007).

## A.  Defendant Fenoglio

The Wexford Defendants concede that knee and back pain constitute serious medical needs, so the Court need not address that point further.  Fenoglio has framed the issue as whether he was "aware of facts from which one could infer that

Plaintiff was at a substantial risk of serious harm, and Plaintiff must show that [Fenoglio] actually drew that inference." (Doc. 147, p. 8). Fenoglio's argument in favor of his position, however, does little more than to restate his undisputed material facts. He simply argues that on specific dates where he offered no treatment to Plaintiff, Fenoglio could not have known that Plaintiff had a serious medical condition. Fenoglio also argues that his treatment was not, in effect, criminally reckless.

As an initial matter, Fenoglio's argument that—on certain dates were he did not examine Plaintiff—he was not aware of Plaintiff's medical condition are clearly frivolous. The Court considers Fenoglio's total knowledge, particularly because Plaintiff's condition is chronic. The record also shows that on certain dates, Fenoglio *chose* not to conduct an examination (or thoroughly review Plaintiff's medical history) regarding Plaintiff's knee and back pain. A reasonable jury could consider the refusal to conduct an examination a form of deliberate indifference.

Fenoglio's second argument is more to the point, but still unavailing. It is undisputed by the parties that Fenoglio examined Plaintiff, prescribed medication, changed Plaintiff's medication, approved his physical therapy, and issued various therapeutic permits. In many cases, this would be sufficient to refute the allegation of deliberate indifference. But here, Plaintiff has submitted medical records issued prior to his incarceration in IDOC and argued that Fenoglio should have considered them in making his treatment decisions. Included in those records is an evaluation and recommendation for knee replacement surgery. Fenoglio himself testified that

prior medical records are the kinds of items a doctor would objectively consider when making treatment decisions.  He testified that he did not do so here.  He also testified that other than ordering the medical records, he took no steps to secure them, and that his discounted Plaintiff's statements that another doctor had recommended the surgery.  Fenoglio justified his course of treatment by stating that it is common for doctors to try conservative therapy prior to more invasive measures, like surgery.  But without the benefits of Plaintiff's prior medical records, Fenoglio could not have made an objective assessment of how effective the conservative treatment would be.

Additionally, it took Fenoglio seven months to come to the conclusion that Plaintiff suffered from osteoarthritis when Plaintiff's previous medical records show that other doctors drew that conclusion in 2008.  During that time period, Fenoglio did nothing to address Plaintiff's complaints of knee and back pain, other than write Plaintiff a low bunk permit (which Plaintiff claims he did not receive).  Fenoglio specifically refused to examine Plaintiff multiple times during this same period.  There was objective information available that Plaintiff suffered from a given condition, but in lieu of accepting that information or examining Plaintiff on that issue, Fenoglio did nothing until Plaintiff's persistent complaints got him to act.  A reasonable jury could find that this constitutes deliberate indifference.

This case is analogous to *Greeno*.  There, prison officials persisted in a course of treatment that they knew to be ineffective over a course of two years.  ***Greeno v. Daley***, 414 F.3d 645, 657 (7th Cir. 2005).  Here, Fenoglio persisted in starting

conservative treatment and made no effort to evaluate Plaintiff's medical history to determine whether such course was appropriate. He then disregarded Plaintiff's complaints that the conservative treatment was inappropriate. Defendants deny that the treatment was inappropriate and point to Plaintiff's medical records that he refused his pain medication. Plaintiff disputes that he refused any pain medication, and has also testified at various times that the pain medication prescribed was ineffective. (Pl.'s Dep. p. 8). The medical records also create an inference that Plaintiff's knee was getting worse over time. For example, Hardy's examination on April 28, 2011 noted no crackling or popping, while a therapist's May 9, 2012 examination found those sounds present. Based on this record, a reasonable jury could find that Plaintiff's condition was not being helped by conservative treatment, and could further find that the Defendants commenced with a conservative course of treatment because they remained deliberately and willfully ignorant of Plaintiff's past medical history, despite his attempts to tell them and show them his medical records.[1] On this record, the Court will not grant summary judgment for Fenoglio.

Summary Judgment is **DENIED as to Defendant Fenoglio.**

### B. Defendant Hardy

The allegations against Defendant Hardy present a closer question. It is undisputed she undertook to provide Plaintiff with x-rays and physical therapy, and by Plaintiff's own testimony Hardy was someone who "was actually helping people."

---

[1] Plaintiff submitted his earlier medical records, sometimes more than once, as part of his filings in this case.

(Pl.'s Dep. p. 15).  Hardy also prescribed Plaintiff Mobic, one of the few medications that Plaintiff agrees helps his knee.  (Pl.'s Dep. p. 8).  But again, on the current record, the Court cannot say that Hardy undertook Plaintiff's care with a clear picture of his medical history, and therefore her subjective decisions are suspect. Hardy, like Fenoglio, noted that Plaintiff's past medical records were needed.  She also did nothing more to follow up on that request.  A reasonable jury could find based on these facts that Hardy was also working from a less than complete medical picture because of her own refusal to take Plaintiff's attempts to self-report the surgery recommendation seriously.  A reasonable jury could find that this constitutes deliberate indifference.  Summary Judgment as to Hardy is likewise **DENIED**.

### C.  Wexford Health Sources

A private corporation cannot be held liable for a constitutional violation unless the violation was caused by a written policy, practice or custom of the corporation.  *Shields v. Illinois Department of Corrections*, 746 F.3d 782 (7th Cir. 2014).  There is no *respondeat superior* liability under § 1983.  *Iskander v. Vill. of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982).  A series of bad acts on behalf of the corporate defendant may raise an inference of such a policy.  *Woodward v. Corr. Med. Servs. of Illinois, Inc.*, 368 F.3d 917, 927 (7th Cir. 2004).  Additionally, the policy or custom actually has to cause the constitutional violation.   *Id.* at 928.

Plaintiff has argued that Wexford has unconstitutional cost cutting policies that require their employees to start with conservative treatment plans.  However,

Plaintiff has not submitted any evidence that Wexford had an unconstitutional written policy.  No policies of any kind have been submitted to the Court.

Plaintiff points to other cases for the proposition that other courts have determined that Wexford's policies were the direct cause of deliberate indifference claims. (Doc. 154, p. 15).  But those cases address the sufficiency of the complaint on a motion to dismiss.  (Doc. 154, p. 15).  That is not the question before this Court, and those cases cannot serve as evidence of a written policy nor provide useful precedent here.  Therefore, the Court presumes that Plaintiff proceeds under a theory that Wexford had an unwritten practice or custom of deliberate indifference.

Plaintiff has done little more than recite the facts of his case as evidence the Wexford had an unconstitutional practice or custom.  That is not sufficient on summary judgment, and the Seventh Circuit rejected a similar attempt in *Shields.* There, the Court found that plaintiff had only shown a series of bad acts. ***Shields,*** **746 F.3d at 796.  *Compare Woodward*, 368 F.3d 917 (finding that a series of bad acts created an inference that the health care provider had an unconstitutional practice where multiple employees reported that they had not received training or policy manuals, employees did not follow policies, the employer knew the employees did not follow policy, and the policy violations directly caused the injury)**.  All Plaintiff has shown here, taking the facts most favorably to him, is that Hardy and Fenoglio failed to take an adequate medical history, failed to objectively consider such a history, and engaged in a conservative course of treatment that was ineffective in lieu of more aggressive measures.  There is no evidence about whether

Wexford had a policy regarding medical histories and whether it was followed here. There is no evidence that Wexford had a policy about knee and back pain, and whether such policies were followed here. There is no evidence that there were other instances in which Wexford employees treated other prisoners in the same manner that they treated Plaintiff.

While a reasonable jury could conclude that Hardy and Fenoglio may have been deliberately indifferent, their individual conduct is not sufficient evidence for a reasonable jury to conclude that Wexford itself had a policy or custom that caused Plaintiff's injuries. Summary judgment as to Wexford Health Sources is **GRANTED**.

### 2.   *IDOC Defendants' Sovereign Immunity Argument*

The IDOC Defendants, who are only in this case in their official capacity for the purposes of prospective injunctive relief, also move for summary judgment on the grounds that "the Court's order requiring Defendants to remain in this case violates the doctrine of sovereign immunity." (Doc. 151). They also argue that they were not personally involved in the constitutional violations at issue here. (Doc. 151).

Defendants' arguments are both patently frivolous and contrary to black letter law. First, the Court addresses the argument that Korte and Godinez cannot be liable because they were not personally involved. Defendants cite to *Palmer v. Marion County* for this proposition. That case does not address official-capacity claims, and is therefore completely irrelevant. **Palmer**, **327 F.3d 588, 593–94 (7th Cir. 2003) (disposing of Defendant "in his individual capacity")**. The Court also agrees with Plaintiff that Korte's and Godinez's citation to *Green v. Mansour* is—at

best— misleading, as the citation does not contain the language suggested by Defendants. *Green*, 474 U.S. 64, 68 (1985) ("*Young* **also held that the Eleventh Amendment does not prevent federal courts from granting prospective relief to prevent a continuing violation of federal law.**"). As the Seventh Circuit has noted several times, denial of medical care can be a continuing violation, and therefore it would appear, even in the absence of the *Gonzales* precedent, which the Court will address shortly, that prospective relief is available in this situation. *See, e.g., Heard v. Sheahan*, 253 F.3d 316, 320 (7th Cir. 2001). The Court rejects the IDOC Defendants' argument that their lack of personal liability precludes their inclusion as defendants for the purposes of injunctive relief.

The IDOC Defendants' second argument is that the Court has no subject matter jurisdiction over the Defendants based on principles of sovereign immunity. The Defendants extrapolate this conclusion out from Supreme Court precedent that states that no retrospective relief is available against state actors, *Green v. Mansour*, 474 U.S. 64, 68 (1985), and Supreme Court precedent that sovereign immunity applies to suits which name state officials but where the state is the real, substantial party in interest. *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997).

The Court disagrees that the Defendants' conclusion can flow from these sources of precedent. First, as discussed above, this case addresses a denial of medical care, and Plaintiff has plead that the violation continues to this day. It is thus, a continuing violation and prospective relief is available. Cases addressing

relief available for *retrospective* violations are not on point.  Additionally, the only test mentioned by the Defendants for determining whether the state is the real, substantial party in interest is whether any liability would be "paid from public funds in the state treasury."  *Edelman v. Jordan*, 415 U.S. 651, 663 (1974).  But there is no claim for damages against the IDOC defendants, so that test is not useful here.

But all of this is beside the point, as the Seventh Circuit has clearly addressed this issue in *Gonzales v. Feinerman*.  **Gonzalez, 663 F.3d 311 (7th Cir. 2011) ("Though [plaintiff] does not allege any specific involvement by [the warden] in the treatment of his hernia, the warden of [the institution] is a proper defendant since [plaintiff] seeks injunctive relief. . . . If [plaintiff] was seeking only damages, the warden's lack of personal involvement would be conclusive . . ., but since [plaintiff] also seeks injunctive relief it is irrelevant whether the warden participated in the alleged violations.")(internal citations omitted)**.  Here, Plaintiff has indicated that he has been transferred four times while in IDOC custody, so Godinez's involvement is necessary.  It is clear from the plain language of *Gonzales* that both Korte and Godinez are appropriate parties for the purposes of carrying out injunctive relief.

Defendants argue *Gonzalez* was wrongly decided.  This Court finds their arguments on this point less than persuasive, as they appear to both gloss earlier precedent and make substantial leaps from the facts present in this case. Defendants also argue that the holding in *Gonzales* is "vague and prevents the

23

Defendants from having knowledge of or defend against the particularities of any order that may be entered against them." That is precisely the point of including them as Defendants. As a named defendant, Korte and Godinez receive notice of all the requests for injunctive relief present in this case, and have an opportunity to respond to those requests, as they did with the currently pending request for injunctive relief. They clearly have had knowledge of, and a chance to defend themselves against any orders entered here. They would not have had the opportunity absent their status as Defendants in this case.

The IDOC defendants also argue that they are simply present as a convenience, in the event the other named Defendants do not comply with the Court's future orders. But Fenoglio no longer works in the IDOC prison system, and Plaintiff is no longer incarcerated at Lawrence were Hardy presumably still works. Neither of those Defendants is in a position to offer to treat Plaintiff in accordance with any orders this Court might enter. If the Court were to order Fenoglio to examine Plaintiff and refer him to a specialist, how would he accomplish that task? Plaintiff is not in Fenoglio's custody or control. The Warden of Western could frustrate the Court's purpose merely by turning Fenoglio away at the door. That leaves Wexford Health Sources, but even if the Court were not inclined to grant their Motion for Summary Judgment here, it is difficult to see how they would carry out any injunctive relief, as their relationship with the IDOC is contractual and presumably limited by the bounds of that contract. Therefore it is necessary to

have a policy-maker of IDOC specifically as a Defendant for the purposes of injunctive relief.

Defendants also argue that the appropriate way to ensure that any injunctive relief is carried out is for Plaintiff to file one of several new suits. The position is contrary to the idea of judicial economy, and Defendants have cited no case law for the proposition. The Court remains unpersuaded by their argument that this procedure would be more "appropriate." Defendants have argued that these alternative lawsuits would give it the opportunity to both "present a proper defense," without incurring the expenses of discovery. Defendants have not explained why a subsequent adjudication would excuse them from discovery options, nor have they submitted any evidence that their discovery obligations in this case were overly burdensome or expensive.[2] Additionally, as noted above, although Defendants repeatedly assert that their presence in this case somehow prevents them from presenting an appropriate or focused defense, they have not explained why this is so, or submitted any facts from which the Court could infer that they have been precluded from defending this case fully. Defendants appeared at the Court's previous hearing on injunctive relief (Doc. 122), and submitted a response to Plaintiff's current request. (Doc. 144). In fact the very solution Defendants propose—a subsequent suit—would allow the Defendants to argue that they should not have to enforce orders that they did not litigate. This is clearly not a workable solution.

---

[2] Based on the materials submitted on summary judgment, it is not clear what discovery the IDOC defendants actually had to produce. Certainly they ignored the Court's earlier order to submit a complete set of Plaintiff's medical records. (Doc. 122, p. 53).

Finally, the IDOC Defendants argue that they may be exposed unjustly to attorney's fees pursuant to 42 U.S.C. § 1997e.  This issue is not ripe, and the Court declines to address it here.  For all of the foregoing reasons, Defendants Korte and Godinez's Motion for Summary Judgment is **DENIED**.  (Doc. 150).

## PLAINTIFF'S SECOND MOTION FOR PRELIMINARY INJUNCTION (DOC. 138) — DENIED

The Court now turns to Plaintiff's Second Motion For a Preliminary Injunction.  (Doc. 139).  While the relevant facts have been recounted above, Plaintiff's main argument is that the exam conducted pursuant to the Court's last order was insufficient because the doctor was not provided with Plaintiff's complete medical history records.  (Doc. 139, p. 19).  As mentioned, *supra.*, the undersigned previously directed the IDOC to have Plaintiff evaluated for his continuing knee and back pain.  Now Plaintiff asks for a referral to an outside specialist.

The purpose of a preliminary injunction is to preserve the status quo until the merits of a case may be resolved.  ***Indiana Civ. Liberties Union v. O'Bannon***, 259 F.3d 766, 770 (7th Cir. 2001).  ***Accord Texas v. Camenisch***, 451 U.S. 390, 395 (1981) (**"the purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."**).  A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." ***Mazurek v. Armstrong***, 520 U.S. 968, 972 (1997). ***Accord Winter v. Natural Res. Def. Council, Inc.***, 555 U.S. 7, 24 (2008) (**"A preliminary injunction is an extraordinary remedy**

never awarded as of right."); *Girl Scouts of Manitou Cnty., Inc. v. Girl Scouts of USA, Inc.*, 549 F.3d 1079, 1085 (7th Cir. 2008) ("[A] preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it.") (internal quotation marks omitted).

To secure a preliminary injunction, a movant must show (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm without the injunction, (3) the harm he would suffer is greater than the harm that the preliminary injunction would inflict on the defendants, and (4) the injunction is in the public interest. *Judge v. Quinn,* 612 F.3d 537, 546 (7th Cir. 2010) (citing *Winter*, 555 U.S. at 20). The considerations are interdependent: the greater the likelihood of success on the merits, the less net harm the injunction must prevent in order for preliminary relief to be warranted. *Judge,* 612 F.3d at 546.

In the context of prisoner litigation, there are further restrictions on courts' remedial power. The scope of the court's authority to enter an injunction in the corrections context is circumscribed by the Prison Litigation Reform Act (PLRA). *Westefer v. Neal*, 682 F.3d 679, 683 (7th Cir. 2012). Under the PLRA, preliminary injunction relief "must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2). *See also Westefer*, 682 F.3d at 683 ("[The PLRA] enforces a point repeatedly made by the Supreme Court in cases challenging prison conditions: prison officials have broad

administrative and discretionary authority over the institutions they manage.")
(internal quotation marks and citation omitted).

In its order on Plaintiff's prior request for injunctive relief, the Court noted
that Plaintiff had shown a reasonable chance of success on the merits, that he could
potentially suffer irreparable harm, that the harm to the defendants was minimal,
and that the injunction was in the public interest. (Doc. 135). The Court based this
finding on medical records submitted by Plaintiff from his time prior to his
incarceration, and evidence regarding his (then-current) treatment at Menard
Correctional Center. The Court narrowly proscribed the injunctive relief because of
the requirements in the PLRA. The Court did not grant Plaintiff's requested
relief—referral to an outside specialist and knee replacement surgery. Instead, the
Court ordered that the IDOC have Plaintiff evaluated for his complaints of pain.

Now Plaintiff argues that this visit is grounds for radically expanding its
prior ruling. The Court has reviewed the medical records from Dr. Baker's April 2,
2014 examination. It is clear from the records that Baker conducted a thorough
examination in which he took a complete history from Plaintiff. It would be ideal
for a doctor in Baker's position to have objective evidence of Plaintiff's past medical
history in the form of medical records. But Plaintiff has not shown any harmed or
prejudice via the IDOC examination, other than the fact that he continues to not
receive his preferred treatment.

The Court is not a doctor and is directed to limit the scope of its prospective
relief to what is necessary, not what Plaintiff finds preferable. The Court did not

initially order a visit to a specialist, despite its knowledge of the earlier medical records and Plaintiff's claims that medical staff was ignoring both the records and him.   There is nothing about the April 2, 2014 that changes the situation so dramatically as to give the Court grounds to reconsider its earlier ruling.   Finally, the earlier ruling was narrowly tailored.   It ordered Plaintiff to be evaluated.   That evaluation has taken place, and a new doctor has found that Plaintiff does not need a referral.   The Court cannot dictate the results of medical examinations.   Plaintiff's Second Motion for a Preliminary Injunction (**Doc. 138**) is **DENIED**.

CONCLUSION

The Motion for Summary Judgment (**Doc. 146**) filed by Defendants Fenoglio, Hardy, and Wexford is **GRANTED IN PART** (as to Wexford) **and DENIED IN PART** (as to Fenoglio and Hardy).   The Clerk is **DIRECTED** to terminate Wexford as a Defendant in the case, and at the close of the case to enter final judgment in Wexford's favor.

The Motion for Summary Judgment filed by Defendants Godinez and Korte (**Doc. 150**) is **DENIED**.

Plaintiff's Second Motion for Preliminary Injunction (**Doc. 138**) is **DENIED**. Plaintiff's individual-capacity claims against Fenoglio and Hardy, plus his official-capacity claims against Korte and Godinez, remain pending.


**IT IS SO ORDERED**.
DATED: February 25, 2015                    *s/ Michael J. Reagan*
                                            **Michael J. Reagan**
                                            Chief Judge, United States District Court